UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| JORGE MERCADO,<br>    *Plaintiff*,<br>    *v.*<br>PRRC, Inc. d/b/a PRICE RITE,<br>    *Defendant.* | Civil No. 3:15cv637 (JBA)<br><br>November 10, 2015 |

**RULING ON MOTION TO DISMISS**

This is an action by Plaintiff Jorge Mercado against his former employer, PRRC, Inc. D/B/A Price Rite ("Price Rite"), alleging race discrimination (Count One), national origin discrimination (Count Two), intentional infliction of emotional distress (Count Three), negligent infliction of emotional distress (Count Four), and defamation (Count Five), all arising out of Mr. Mercado's employment at and termination from Price Rite. Price Rite now moves [Doc. # 28] to dismiss Counts Three and Four, on the grounds that they do not state a claim for which relief can be granted. Oral argument was scheduled for November 6, 2015 but did not proceed because Plaintiff's counsel did not appear. For the following reasons, based on the parties' filings, Price Rite's motion is granted in part and denied in part.

**I.      Factual Allegations**

Plaintiff alleges the following facts in his Amended Complaint [Doc. # 26]. Mr. Mercado is a native of Puerto Rico, and his primary language is Spanish. (Am. Compl. ¶¶ 8–9.) He began working for Price Rite in November 2009 as a member of the night crew. (*Id.* ¶ 7.) In 2010, he was promoted to Night Shift Manager, and he continued in that position until he was terminated on April 9, 2014. (*Id.* ¶ 11.) From November 2009

through April 2013, Plaintiff excelled at work, receiving only positive feedback. (*Id.* ¶¶ 13–14.) However, that changed in April 2013 when a new store manager, Gary Semrau, was hired. (*Id.* ¶¶ 15, 19.)

"From the onset of Mr. Semrau's tenure as Store Manager, he frequently commented on Plaintiff's inability to speak perfect English, stating 'It's not my fault you can't speak English!'" (*Id.* ¶ 19.) Mr. Semrau frequently made such comments in the presence of other co-workers. (*Id.* ¶ 20.) In addition, Mr. Semrau refused to provide Mr. Mercado with an interpreter, and would frequently tell Plaintiff and other Spanish-speaking employees to "Go back to Puerto Rico" and mock them for not speaking English. (*Id.* ¶¶ 21–23.) Although Plaintiff's work performance did not decline after Mr. Semrau was hired, Mr. Semrau frequently subjected Plaintiff to unwarranted and pretextual discipline, including "scream[ing'] and yell[ing]" at him in the presence of co-workers. (*Id.* ¶¶ 25–27.)

On April 9, 2014, Plaintiff arrived at work to find eight to ten police officers standing outside six police cruisers, waiting for him. (*Id.* ¶¶ 29–30.) When he identified himself, the police "immediately swarmed [his] car, placed [him] in handcuffs[,] . . . advised him that he was being arrested for threatening an[other] employee with a gun," and placed him in the back of a police cruiser to await the arrival of a Spanish interpreter. (*Id.* ¶¶ 32–33.) When an interpreter arrived, Mr. Mercado told the police that he had never threatened anyone with a gun and asked to see the store's surveillance tapes to prove the alleged incident never happened. (*Id.* ¶ 34.) The police informed him, however, that the day shift manager had refused to release the tapes. (*Id.* ¶ 35.) Plaintiff was released, as there was no evidence against him. (*Id.*) "Upon being released, Plaintiff asked

[the day shift manager] what happened and [the manager] advised [him] to turn in his store keys and leave the premises immediately." (*Id.* ¶ 36.) A few days later, Price Rite began advertising to fill Plaintiff's position. (*Id.* ¶ 37.) When Plaintiff sought work at different Price Rite locations and other stores, he "was denied employment and was informed it was because [he] 'had a bad record'" and because he had 'assaulted someone.'" (*Id.* ¶¶ 40–41.)

II.    Discussion[1]

   A. **Count Three (Intentional Infliction of Emotional Distress)**

Plaintiff alleges that Defendant, through its agents, intentionally inflicted emotional distress on him by "verbally abus[ing] and pretextually disciplin[ing] [him] for a year, creating a hostile work environment." (Opp'n Mot. to Dismiss [Doc. # 31] at 10.)

Defendant asserts that "Plaintiff has not alleged facts supporting intentional infliction of emotional distress" ("IIED") because "the conduct attributed to Price Rite does not rise to the high-level of extreme and outrageous conduct required by courts in Connecticut" and "Plaintiff has not alleged facts showing that Price Rite's alleged conduct was intended or calculated to cause Plaintiff severe emotional distress." (Mem. Supp. Mot. to Dismiss [Doc. # 28-1] at 4, 5, 7.)

---

[1] "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). Although detailed allegations are not required, a claim will be found facially plausible only if "the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. Conclusory allegations are not sufficient. *Id.* at 678–79; *see also* Fed. R. Civ. P. 12(b)(6).

In order to make out a colorable claim for IIED in Connecticut, the plaintiff must allege:

> (1) that the [defendant] intended to inflict emotional distress or that he knew or should have known that emotional distress was the likely result of his conduct; (2) that the conduct was extreme and outrageous; (3) that the defendant's conduct was the cause of the plaintiff's distress; and (4) that the emotional distress sustained by the plaintiff was severe.

*Appleton v. Bd. of Educ. of Town of Stonington*, 254 Conn. 205, 210 (2000) (internal quotation marks omitted). "Whether a defendant's conduct is sufficient to satisfy the requirement that it be extreme and outrageous is initially a question for the court to determine. Only where reasonable minds disagree does it become an issue for the jury." *Id.* (internal citations omitted).

"Both federal and state courts in Connecticut have interpreted the qualification of 'extreme and outrageous conduct' strictly." *Nguyen v. People's United Bank*, No. 3:10-CV-455 (CFD), 2010 WL 4918706, at *2 (D. Conn. Nov. 23, 2010). Liability is imposed "only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." *Appleton*, 254 Conn. at 211 (internal quotation marks and citations omitted). "Conduct on the part of the defendant that is merely insulting or displays bad manners or results in hurt feelings is insufficient to form the basis for an action based upon intentional infliction of emotional distress." *Id.* (internal quotation marks omitted).

"'In the employment context, it is the employer's conduct, not the motive behind the conduct, that must be extreme or outrageous.'" *Robinson v. City of New Haven*, 578 F.

Supp. 2d 385, 390 (D. Conn. 2008) (quoting *Miner v. Town of Cheshire,* 126 F. Supp. 2d 184, 195 (D. Conn. 2000)). "[C]laims of employer misconduct in the form of intentional discrimination or retaliation, including discharge, which challenge motive or intent, are dismissed unless the manifesting conduct is itself outrageous or extreme." *Credle-Brown v. Connecticut*, 502 F. Supp. 2d 292, 300 (D. Conn. 2007) (internal quotation marks omitted).

Thus, courts have found colorable claims of IIED in the employment context where the plaintiff alleged:

(1) That her supervisor "used sexual analogies to describe her employment duties . . ., subjected her to sexist language . . ., engaged in inappropriate touching, . . . and stated that he would discharge her if she cut her hair," *Kilduff v. Cosential, Inc.*, 289 F. Supp. 2d 12, 22 (D. Conn. 2003);

(2) That her supervisor encouraged her coworkers to make "false complaints to the police about parental neglect, disable[e] [her] workstation chair so it [would] fall[] apart when sat on, and intentional[ly] spray[] work surfaces with products known to be noxious to [her]," *Juleson v. Masterson*, CV020466932S, 2004 Conn. Super. LEXIS 1878 (July 13, 2004);

(3) That her supervisor subjected her "to a course of verbal abuse and profanity," suggested she was a prostitute, "ridiculed [her] about her appearance in a sexually demeaning manner," "physically struck [her] in the head and face with a hand, box or other items," and subjected her to "degrading conditions in order to use the restroom," *Pottie v. Atl. Packaging Grp., LLC*, No. 3:12CV773 (WIG), 2012 WL 6087282, at *3 (D. Conn. Dec. 6, 2012);

(4) That his supervisor "threw a piece of meat at [him], while [he] was at the meat cutting bench, butcher knife in hand, cutting meat," *Ferraro v. Stop and Shop Supermarket Co.*, No. CV 960388031S, 2000 WL 768525, at *1 (Conn. Super. Ct. May 25, 2000);

(5) That her supervisor repeatedly made "derogatory comments regarding [her] weight, religion, and gender," refused to sign her time sheets, repeatedly withheld her pay, made false accusations about her performance, threatened to fire her, and prevented her from going home sick, *Sangan v. Yale University*, No. 3:06cv587 (PCD), 2006 WL 2682240, at *6 (D. Conn. Sept. 15, 2006); and

(6) That her supervisor subjected her "to constant harassment targeted at her professional competence and socioeconomic status," "publicly insulted [her] in highly personal ways," failed to act on her complaints that another teacher was "verbally abusing underperforming and minority children in [her] presence," gave her poor evaluations, "instigated her transfer" to another school, and stole documentation of her mistreatment from her personal belongings, *Davis v. City of Hartford*, 601 F. Supp. 2d 488, 495 (D. Conn. 2009).

Courts have rejected claims of IIED in the employment context where a plaintiff alleged that:

(1) His supervisor unfairly disciplined him, refused to promote him, assigned him more work and more strenuous work than white employees, refused to allow him to work overtime, refused to give him a positive year-end review, singled

6

"him out in front of other employees in an attempt to embarrass him," and one occasion, "grabbed his arms and yanked them to his sides, telling him he was not allowed to cross his arms while she spoke," *Williams v. Deloitte Servs., LP,* No. 3:09-CV-17 (JCH), 2009 WL 3571365, at *2–3 (D. Conn. Oct. 26, 2009);

(2) Her supervisor spoke rudely to her, belittled her, refused to speak to her, misrepresented her job performance, and retaliated against her by having co-workers write negative comments about her in her personnel file, *Knight v. Southeastern Council on Alcoholism  Drug Dependency,* No. 557182, 2001 WL 1231825, at *3–4 (Conn. Super. Ct. Sept. 24, 2001);

(3) His supervisor "falsely accused [him] of disclosing trade secrets, took improper disciplinary action against him, blamed, harassed and embarrassed him for the mistakes of others, ridiculed him, rejected his work and placed him on probation while he was on medical leave," *Taylor v. Maxxim Med., Inc.,* No: 3:99CV338 (AHN), 2000 U.S. Dist. LEXIS 19727 (D. Conn. 2000);

(4) His employer supervised him closely, spoke to him in a demeaning and unprofessional manner, unfairly appraised his job performance, gave him inferior office space, denied him pay raises and promotions, insulted his lunch, and discriminated against him on the basis of race and/or national origin, *Lorenzi v. Connecticut Judicial Branch,* 620 F. Supp. 2d 348, 353 (D. Conn. 2009);

(5) Her employer failed to provide her with a desk or pager, delayed her receipt of business cards, delayed recognition of her achievements, refused to promote

her, terminated her, and insulted her, *Adams v. Hartford Courant*, No. 3:03cv0477 (JCH), 2004 U.S. Dist. LEXIS 8546, at *12 (D. Conn. May 14, 2003);

(6) His employer refused to promote him, insulted him, and excluded him from training and company publications, *Javier v. Engelhard Corp.*, No. 3:00CV2301 (JCH), 2001 U.S. Dist. Lexis 17341 at *14 (D. Conn. Oct. 1, 2001);

(7) Her employer "made condescending comments to [her] in front of [her] fellow colleagues questioning [her] vision and ability to read," called her daughter, representing that the plaintiff "had been acting differently," called the police, who came to the school and escorted the plaintiff out of the building to her car, subjected her to two psychiatric examinations, and forced her to take a suspension and a leave of absence and, ultimately, to resign, *Appleton*, 254 Conn. at 211;

(8) Her supervisor threatened her because of her race, belittled her in front of clients, harassed her, and intimidated her, *Tomby v. Cmty. Renewal Team, Inc.*, No. 3:09-CV-1596 (CFD), 2010 WL 5174404, at *8 (D. Conn. Dec. 15, 2010); and

(9) His supervisor referred "to black people using the term 'moly,' a derogatory term . . . , on two to five occasions," "commented to him on the eating habits of another African-American employee, stating '[a]ll you brothers like eating all that garbage, ribs, chicken," and "commented to him about hats worn by the plaintiff and another African-American employee, telling him, 'You can't be pimping around with them hats,'" *Coleman v. South Cent. Conn. Regional*

*Water Auth.*, No. 3:06cv1515 (RNC), 2009 WL 350597, at *2 (D. Conn. Feb. 12, 2009).

Here, Plaintiff asserts that he has made out a claim for intentional infliction of emotional distress by alleging that: (1) Mr. Semrau engaged in a "repeated pattern of verbal abuse regarding the Plaintiff's race and national origin;" (2) Mr. Semrau abused his "managerial position to continually harass and discipline the plaintiff for pretextual employment issues due to race and national origin discrimination;"[2] and (3) Mr. Semrau "public[ly] ridicule[d]" him "in front of other employees."[3] (Opp'n at 9.)

While forcing an employee to endure severe supervisory mistreatment could rise to the very high level of outrageousness required by Connecticut courts to state a claim

---

[2] Though Plaintiff is no doubt correct that in some circumstances, a supervisor's otherwise non-outrageous conduct could be transformed into outrageous conduct because of his managerial position, the inquiry is a fact-specific one. As is clear from the caselaw discussed above, many claims by employees about their supervisor's actions fall short of the legal standard for extreme and outrageous.

[3] Plaintiff cites *Knight v. Southeastern Council on Alcoholism  Drug Dependency*, No. 557182, 2001 WL 1231825, at *3–4 (Conn. Super. Ct. Sept. 24, 2001) for the proposition that "courts have found the requisite elements of the tort of intentional infliction of emotion distress in the employment context when the plaintiff was subjected to public ridicule." (Opp'n at 8–9.) While *Knight* does state that "Plaintiffs have . . . been successful in establishing claims for intentional infliction of emotional distress where they have alleged that they were forced to suffer public ridicule," it relies for support on a single case which does not provide support for that statement. *Ferraro v. Stop and Shop Supermarket Co.*, No. CV 960388031S, 2000 WL 768525, at *1 (Conn. Super. Ct. May 25, 2000), the cited case, in fact rejects all of the plaintiff's claims which rested on public ridicule, finding that the only plausible claim for IIED in the plaintiff's complaint was the allegation that the plaintiff's supervisor had thrown a piece of meat at him while he was working at the cutting table with a knife. Thus, while an allegation of public ridicule may, in some circumstances, support a claim of IIED, it does not, *ipso facto*, transform a non-plausible claim into a plausible claim.

for IIED, Plaintiff's allegations fall short of this threshold. Putting aside, as the Court must, see *Robinson*, 578 F. Supp. 2d at 390, the alleged motivation for Mr. Semrau's actions, no reasonable jury applying Connecticut law could find that his conduct itself was "so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community," *Appleton*, 254 Conn. at 211, as distinguished from the conduct giving rise to a claim for negligent infliction of emotional distress, as discussed below. Therefore, Defendant's motion to dismiss as to Count Three is granted.

### B. Count Four (Negligent Infliction of Emotional Distress)

In Count Four, Plaintiff asserts that Defendant negligently inflicted emotional distress upon him by "continuously insulting, humiliating, [and] falsely accusing [him] of assaulting someone and calling the police." (Am. Compl. Count Four ¶ 44.)

To prevail on a claim for negligent infliction of emotional distress ("NIED") in Connecticut, "a plaintiff must prove that the defendant's conduct created an unreasonable risk of causing the plaintiff emotional distress, the plaintiff's distress was foreseeable, the emotional distress was severe enough that it might result in illness or bodily harm, and finally, that the defendant's conduct was the cause of the plaintiff's distress." *Olson v. Burlington-Bristol Health Dist.*, 87 Conn. App. 1, 5 (2005). "Connecticut law does not require extreme and outrageous conduct to establish a claim of [NIED]. . . . It does, however, require a showing that 'the defendant should have realized that its conduct involved an unreasonable risk of causing emotional distress and that that distress, it if were caused might result in illness or bodily harm.'" *Balsamo v. Finkle*, No.

3:06cv1325 (JCH), 2007 WL 1456134, at *3 (D. Conn. May 17, 2007) (quoting *Carrol v. Allstate Ins. Co.*, 262 Conn. 433, 446 (2003)).

In the employment context, NIED "arises only where it is based upon unreasonable conduct of the defendant in the termination process. The mere termination of employment, even where it is wrongful, is . . . not, by itself, enough to sustain a claim for negligent infliction of emotional distress." *Parsons v. United Techs. Corp, Sikorsky Aircraft Div.*, 243 Conn. 66, 88–89 (1997) (internal quotation marks and citations omitted); *see Perodeau v. City of Hartford*, 259 Conn. 729, 762–63 (2002) (holding that cognizable NIED claims must arise out of "conduct occurring in the termination of employment"). Thus, "[t]he tort of negligent infliction of emotional distress focuses on the manner of discharge; whether the employer's conduct in the termination was unreasonable, not whether the termination of employment was unreasonable." *Martin-Glave v. Aventis Pharm.*, No. 3:03cv1482 (EBB), 2003 WL 23185867, at *5 (D. Conn. Dec. 11, 2003) (internal quotation marks omitted). "[I]n order to sustain a claim of negligent infliction of emotional distress in this setting, [the plaintiff] must allege that his actual discharge was done in an inconsiderate, humiliating or embarrassing manner." *Copeland v. Home and Community Health Servs, Inc.*, 285 F. Supp. 2d 144, 152 (D. Conn. 2003) (internal quotation marks omitted).

Here, Plaintiff asserts that "Defendant knew or should have known that [its] conduct, during Plaintiff's termination of employment on April 9, 2014, involved an unreasonable risk of causing the plaintiff emotional distress." (Am. Compl. Count Four ¶ 42.) Defendant responds with three alternative arguments: (1) Plaintiff was not terminated, and an NIED claim can only be raised in the context of terminations; (2) even

11

if Plaintiff was terminated, his Complaint does not allege that the employer called the police as part of the termination process; and (3) if Plaintiff was terminated and the employer did call the police as part of the termination process, it was not unreasonable to do so.

These arguments lack merit. First, whether or not Plaintiff was in fact terminated is not at issue at this stage; he has alleged that he was, and that suffices for purposes of a motion to dismiss. (*See* Am. Compl. ¶ 29 ("On April 9, 2014, Plaintiff's employment with Defendant Company was terminated."); *id.* ¶ 39 ("The purported reason for termination is a pretext for discrimination on the basis of Plaintiff's national origin and race."); *id.* ¶ 40 ("Since Plaintiff's termination on April 9, 2014 . . . ."); *id.* ¶ 44 ("The Defendant's firing of Plaintiff was discriminatory . . . .")); *see also Copeland*, 285 F. Supp. 2d at 147, 153 (finding the plaintiff had adequately alleged NIED where the employer implied, without directly stating, that the plaintiff was fired and the plaintiff reasonably understood that she had been terminated).

Second, while it is true that Plaintiff's allegations regarding his employer's involvement in the calling of the police could certainly have been more artfully pleaded, the Complaint can plausibly be read to assert that Defendant called the police as part of its effort to precipitate Plaintiff's termination. Plaintiff alleges, for example, that "Defendant's conduct . . . [in] calling the police caused the plaintiff emotional distress." (Am. Compl. Count Four ¶ 44.) He adds that after a year of verbal abuse by his supervisor, he arrived at work one day to find the police waiting for him, right outside Price Rite. (*Id.* ¶ 30.) Although Plaintiff was accused of threatening another employee with a gun (presumably at Price Rite), the day manager refused to release the surveillance

tapes to the police which would have proved or disproved the allegation. (*Id.* ¶ 35.) Finding no evidence against him, the police released Plaintiff, and immediately thereafter, the day manager instructed him to turn in his store keys and immediately leave the premises. (*Id.* ¶ 36.)

When one additionally considers the allegations that due to Defendant calling the police, (1) eight to ten police officers were standing outside six police cruisers, right outside his workplace, in front of colleagues, when he arrived at work; (2) those officers "immediately swarmed" Plaintiff's car; (3) placed him in handcuffs; and (4) made him sit in the police car handcuffed while they awaited the arrival of a Spanish-speaking officer (all of which were reasonably foreseeable consequences of informing the police that Plaintiff had threatened another employee with a gun in a public supermarket), a plausible claim of negligent infliction of emotional distress emerges.

*Parsons*, cited by Defendant, does not compel a different conclusion. There, the Supreme Court of Connecticut upheld the trial court's decision to strike the plaintiff's NIED claim where the plaintiff, an employee of Sikorsky Aircraft, refused to travel to Bahrain, citing security concerns, and "[w]ithin two hours of [his] refusal, the defendant terminated [his] employment and removed him from the building under security escort." 243 Conn. at 70. The court explained that "the actions that the defendant took in terminating the employment of the plaintiff . . . were not so unreasonable as to support a cause of action for negligent infliction of emotional distress," and further, "it is not patently unreasonable for an employer to remove a discharged employee from its premises under a security escort." *Id.* at 89.

13

As Plaintiff notes, however, there is an important distinction between a security escort out of a building and a cadre of police officers that "swarms" an employee as he arrives at work, places him in handcuffs, and puts him in a police car, all in front of customers and co-workers.[4] In the circumstances alleged here, a reasonable jury could find that the involvement of the police in Plaintiff's termination process was unreasonable, such that Plaintiff has stated a plausible claim for negligent infliction of emotional distress.

III.   **Conclusion**

For the foregoing reasons, Defendant's Motion [Doc. # 28] to Dismiss is GRANTED as to Count Three and DENIED as to Count Four.


IT IS SO ORDERED.

    /s/
Janet Bond Arterton, U.S.D.J.


Dated at New Haven, Connecticut this 10th day of November 2015.

---

[4] The second distinction Plaintiff draws, between a secure facility like Sikorsky and a supermarket, is less persuasive. There is no indication in *Parsons* or subsequent caselaw that a security escort is only reasonable where the employee works in a secure facility. Indeed, *Appleton*, which cites *Parsons* (albeit in the context of discussing an IIED claim), involved a teacher at a school. *See* 254 Conn. at 211–12.